**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF OREGON**

| | |
|---|---|
| **FALLON HUGHES**, | Case No. 3:21-cv-991-SI |
| Plaintiff, | **OPINION AND ORDER** |
| v. | |
| **PACIFIC UNIVERSITY**, | |
| Defendant. | |

Daniel Snyder, Carl Post, and John Burgess, LAW OFFICES OF DANIEL SNYDER, 1000 SW Broadway, Suite 2400, Portland, OR 97205. Of Attorneys for Plaintiff.

Naomi Levelle Haslitt, Erin M. Burris, and Eden E. Vasquez, MILLER NASH LLP, U.S. Bancorp Tower, 111 SW Fifth Ave., Suite 3400, Portland, OR 97204. Of Attorneys for Defendant.

**Michael H. Simon, District Judge.**

Plaintiff Fallon Hughes (Hughes) brings two sets of claims against Defendant Pacific University (the University), her former employer. In her first set of claims, Hughes sues under Title VII Civil Rights Act of 1964, 42 U.S.C. § 2000e, alleging discrimination and retaliation because of sex and gender. Hughes also brings supplemental state-law claims of unlawful employment practices under Oregon Revised Statutes (ORS) § 659A.030 (discrimination) and ORS § 659A.199 (whistleblower retaliation), as well as common-law wrongful termination. In her second set of claims, Hughes alleges violations of the federal Family and Medical Leave Act

of 1993 (FMLA), 29 U.S.C. § 2601, *et seq.*, the corresponding Oregon Family Leave Act, ORS §§ 659A.150, *et seq*, and Oregon's Sick Leave Act, ORS § 653.641. Hughes seeks economic and noneconomic damages, equitable relief, and attorney's fees.

The University moves for partial summary judgment on Hughes's first set of claims under federal and state law for discrimination, retaliation, and wrongful termination. The University does not currently challenge the second set of claims. For the reasons discussed below, the Court grants the University's motion for partial summary judgment.[1]

## STANDARDS

A party is entitled to summary judgment if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the burden of establishing the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The court must view the evidence in the light most favorable to the non-movant and draw all reasonable inferences in the non-movant's favor. *Clicks Billiards, Inc. v. Sixshooters, Inc.*, 251 F.3d 1252, 1257 (9th Cir. 2001). Although "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ruling on a motion for summary judgment," the "mere existence of a scintilla of evidence in support of the plaintiff's position [is] insufficient . . . ." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 255 (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation and quotation marks omitted).

---

[1] The Court does not believe that oral argument will help resolve the pending motion. *See* L.R. 7-1(d)(1).

In evaluating the nonmoving party's facts offered at summary judgment, the Court does "not focus on the admissibility of the evidence's form. [The Court] instead focus[es] on the admissibility of its contents." *Fraser v. Goodale*, 342 F.3d 1032, 1036 (9th Cir. 2003); *see also Celotex*, 477 U.S. at 324 ("We do not mean that the nonmoving party must produce evidence in a form that would be admissible at trial in order to avoid summary judgment."); *Sandoval v. Cnty. of San Diego*, 985 F.3d 657, 665-66 (9th Cir. 2021) (rejecting relevance, hearsay, and foundation evidentiary objections at summary judgment). At summary judgment, the Court may consider "evidence submitted in an inadmissible form, so long as the underlying evidence could be provided in an admissible form at trial, such as by live testimony." *JL Beverage Co., LLC v. Jim Beam Brands Co.*, 828 F.3d 1098, 1110 (9th Cir. 2016).

## BACKGROUND[2]

### A.  Hughes's Position at the University

On June 12, 2018, Reza Karimigevari (Dean Karimi), the Dean of the University's School of Pharmacy (SOP), offered Hughes a position in the SOP's Office of Experiential Education (OEE). Students in the SOP Doctor of Pharmacy program must engage in experiential rotations in clinics, hospitals, or laboratories to acquire experience working in the field with pharmacists. The SOP's OEE oversees students' experiential rotations and OEE staff ensure that students comply with all applicable laws and rules needed to enable them to participate in the rotations.

Hughes started her job in the OEE as the Coordinator for Experiential Compliance (CEC) on July 9, 2018. As the CEC, Hughes was responsible for ensuring that about 300 pharmacy

---

[2] The Court summarizes only the facts relevant to the claims at issue in the pending motion for partial summary judgment and omits unrelated facts, including those pertaining to Hughes's claims regarding her medical leave.

students complied with University, state, and federal requirements for their experiential rotations, including vaccinations, trainings, and certifications. Hughes was the point person for notifying pharmacy students about deadlines and site requirements. Student contact was a large portion of Hughes's role; she communicated with students by phone, email, and in person.

Hughes shared an office with Melanie Belles, the Coordinator for Experiential Education (CEE). Hughes and Belles were the only two coordinators for experiential education at the SOP. Although the two coordinators had different job responsibilities, they shared common duties and goals related to the students' experiential education and were trained to cover each other's jobs. Both jobs required working directly with students and serving as liaisons between the SOP and the pharmacy practice community.

## B.  Remote Work Policy

The University's remote work policy states that staff supervisors make remote work decisions for their departments. Dr. Anita Cleven, Hughes's supervisor, preferred to have one coordinator, either Hughes or Belles, in the OEE office every day. Dr. Cleven believed that having at least one coordinator on-site was important to serve SOP students, who would sometimes drop by the OEE office to meet with a coordinator without a prior appointment or advance notice. Dr. Cleven communicated this preference by email before Hughes started her job. Although Dr. Cleven permitted each coordinator to work remotely about one day per week, she requested that they inform her of those days in advance and seek approval and that they both not work remotely on the same days. According to the University, Hughes failed to seek approval for remote work on several occasions. Cleven Decl. ¶¶ 15-16, ECF 35.

In fall 2018, Dean Karimi came to the OEE office to speak with Hughes or Belles, but neither was present. After that, in mid-October 2018, Dr. Cleven met with the OEE team and reiterated her expectation that Hughes and Belles could not both work remotely on the same day

because one had to be in the office on working days. This remote work expectation applied only to Hughes and Belles.

The OEE had two other employees, Dr. Huy Hoang and Jackson Ross. Dr. Hoang's role in the OEE was to identify potential experiential sites, such as off-site laboratories and hospitals. He was not the primary contact for students as part of his OEE work. Ross handled similar responsibilities to Hughes at one point, but in 2017 was promoted to the Admissions and Experiential Strategist in the SOP. As a strategist for the OEE, Ross handled technology and operations; Ross was not a primary student contact. Ross also split his role between two departments and had two supervisors: he worked part-time with the OEE and part-time in the Office of Student Affairs (OSA). Ross's work was not evenly split, and he sometimes spent more time working for the OSA than for the OEE, so Dr. Cleven could not rely on Ross for on-site coverage for the coordinators. Cleven Decl. ¶ 5. If Ross wished to work remotely, he had to check with both supervisors.

**C.  Professional Development Funds**

Each staff member in the SOP received $2,000 per academic year for professional development. Hughes could use these funds for attending conferences or taking courses with approval. Hughes learned that Belles received professional development funds to take online courses for a certificate in instructional design. Hughes observed Belles completing her online coursework during the workday.

On or about August 29, 2018, Hughes requested to use professional development funds to complete a course at Portland State University on strategic communication. The course required four four-week online courses to be completed during five months. Hughes discussed the request with Dr. Cleven. According to Hughes, Dr. Cleven stated that she "felt that [Hughes] was planning a wedding and that would be too much to put on [Hughes's] plate to have the course at

the same time. She stated that she assumed [Hughes] did not have help in planning the wedding from [Hughes's] then fiancé." Hughes Dep. 134:25-135:9, ECF 33-1.

Dr. Cleven testified that she did not deny the funds and merely discussed the course with Hughes. Cleven Dep. 39:17-40:6, ECF 33-3 ("She wasn't denied the opportunity . . . we had a few conversations around it, and it dropped."). Dr. Cleven also explained that "[Hughes] had indicated that she wanted time away to pursue this opportunity which would mean that she would be out of the office during one of the busiest times where she was being trained on operations" and "it wasn't feasible to be gone during that time." *Id.* Hughes would not have received extra pay if she had completed the course and did not know whether the course might alter her job functions.

Hughes alleges that Dr. Cleven denied Hughes's use of the professional development funds. Hughes adds that she called Michele Quint, a representative of the University's Human Resources (HR) department. Quint did not pick up, and Hughes left a message. In her message, Hughes said that she wanted to lodge a complaint of sexism and that planning a wedding was irrelevant to her work and development. Hughes still did not receive a call back. Hughes then reached out to Jennifer Yruegas, the University's General Counsel and Associate Vice President of HR. Hughes called Yruegas twice in September 2018 concerning the development funds and left a voicemail message both times. In the second message, Hughes allegedly stated that she was the victim of sexism because the rules were being applied differently to her because of her sex. Hughes Decl. ¶ 25, ECF 45.[3]

---

[3] As discussed below, the University disputes this portion of Hughes's declaration as inconsistent with her deposition testimony.

PAGE 6 – OPINION AND ORDER

**D. SOPAC Survey**

Staff members generally participate on a SOP committee. SOP committees support various operations of the SOP. Hughes participated on the SOP's Assessment Committee (SOPAC) as the staff representative.[4] The SOPAC's mission was to assess the SOP's program, curriculum, co-curricular affairs, and other areas with the overall goal of ensuring compliance with the SOP's accrediting body, the Accreditation Council for Pharmacy Education (ACPE). ACPE requires SOPAC to conduct surveys in assessment areas that the Dean and SOP Executive Committee provide. SOPAC offers recommendations based on collected survey data.

In 2018, the SOP's Executive Committee decided the SOPAC should survey SOP staff to gather their feedback on the working environment at the SOP. Because a few years had passed since the SOPAC had conducted a staff survey, the SOP Executive Committee directed the SOPAC to undertake a new staff survey. Dr. Nicola Carter, the chair of the SOPAC, asked SOP staff to create and run the survey. Hughes was already a SOPAC member, so she and Andrew Longhofer, another SOP employee, developed a survey using qualitative research methods. After receiving the survey responses from staff, Hughes and Longhofer collated the responses into a draft report that the whole team worked together to revise. In February 2019, Hughes sent the draft report to Dr. Carter. The SOPAC then formed a subcommittee, which included Hughes, to prepare an executive summary of the report.

Some of the staff survey responses described incidents of alleged sexism, racism, and illegal employment practices, such as employees not getting lunch or rest breaks. In March 2019,

---

[4] According to Hughes, Dean Karimi assigned Hughes to the SOPAC, where she served as staff representative. ECF 45 at 4 (Hughes Decl. ¶¶ 15-16); Cleven Dep. 38:7-19, ECF 44 at 101. Dean Karimi denies that he appointed Hughes to the SOPAC and claims she misrepresented her role as staff representative. Karimi Dep. 28:23-29:1, 78:8-10, ECF 44 at 234, 274.

Hughes emailed Yruegas, the HR director, to request an in-person meeting. Hughes states in her declaration that she emailed Yruegas because she "wanted to discuss the systemic gender problems revealed in the staff feedback survey." Hughes Decl. ¶ 32. Hughes does not, however, state that she informed Yruegas of the purpose of Hughes's request for a meeting or provide the Court with a copy of the email to Yruegas or cite to its location in the record.[5] Hughes did not receive a response from Yruegas.

In early April 2019, Dr. Carter presented the executive summary to Dean Karimi. Dean Karimi had a negative reaction to the staff survey. Dr. Carter did not tell Dean Karimi that Hughes participated in collating survey information. Dr. Carter then revised the summary based on Dean Karimi's feedback.

On May 29, 2019, the SOP executive committee discussed the SOPAC report, including the claims of discrimination, sexism, and other forms of workplace bias that staff expressed in the survey. Based on a suggestion from the Executive Committee, Dean Karimi invited Yruegas to attend the next staff meeting on June 10, 2019. This meeting was rescheduled to July 2019. At the July meeting, Yruegas said that an outside group would be hired to do communication and mediation training.

**E.  April 2019 Meeting with Dean Karimi**

On April 9, 2019, Dean Karimi emailed SOP staff stating his intention to attend the next staff meeting and discuss staff committee roles. Hughes responded by email to Dean Karimi acknowledging his plan and stating that "we'll refrain from thoughts and concerns until SOPAC

---

[5] The Court "need not paw over the files without assistance from the parties." *Orr v. Bank of Am., NT & SA*, 285 F.3d 764, 775 (9th Cir. 2002); *see also* LR 56-1(a) ("A party's factual positions must be supported by citations, by page and line as appropriate, to the particular parts of materials in the record.").

has delivered the feedback recommendation report." Snyder Decl. Ex. 3, ECF 44 at 10. The next

morning, Dean Karimi requested to meet with Hughes at 11:00 AM in his office that day "to

understand your e-mail better." *Id.* at 11. Hughes told him that she was working from home and

could not meet in person that day but offered to do a video chat. Dean Karimi responded, "I

regret to tell you that it is unfortunate that I can't see you today. I'll find another time next week

to discuss the e-mail and your [remote work] privilege." Snyder Decl. Ex. 8, ECF 44 at 21.

On April 12, 2019, Dr. Cleven told Hughes that she was to meet Dean Karimi face-to-

face on April 16, 2019. Dr. Cleven also told Hughes that she could not work from home until the

April 16th meeting to discuss her remote work privileges. On April 16, 2019, Hughes was ill.

Dean Karimi met with Hughes on April 22, 2019. Dean Karimi asked Hughes why she

had sent an email on behalf of the entire staff. He confronted Hughes about misrepresenting

herself as the SOPAC staff representative and denied appointing her to that position. Hughes

describes Dean Karimi's behavior as hostile and aggressive, and that it was uncomfortable to be

in the meeting. Hughes Dep. 251:12-24.[6] Dean Karimi also confronted Hughes for deciding the

format of the staff survey. Finally, Dean Karimi discussed Hughes's remote work privileges.

According to Hughes, he stated that "only good employees can work-at-home." Hughes Decl.

¶ 42.

**F.  Hughes's Termination from Employment**

In February 2020, Hughes's new manager, Dr. Madeline Michelle Fry, and Dean Karimi

sought counsel from Yruegas about Hughes's alleged performance issues. On February 17th,

Dr. Fry and Dean Karimi sent to Yruegas a summary of concerns about Hughes's work. Fry

---

[6] Although the University disagrees with Hughes's characterizations of Dean Karimi in
the April 2019 meeting, for purposes of the pending motion the University accepts Hughes's
version.

Decl. ¶ 6, Ex. 1, ECF 36. They identified multiple performance issues, including failure to inform colleagues about work priorities, failure to inform internal and external individuals about absences, failure to seek approval to work from home or use compensatory (comp) time, and failure to use an out-of-office message.[7] *Id.* Dr. Fry and Dean Karimi were also concerned that Hughes communicated poorly with students and caused a student stress in January 2020 regarding potential disclosure of the student's medical records.[8] Fry Decl. ¶¶ 6, 9-10, Ex. 1, 3. In his email to Yruegas, Dean Karimi stated that Hughes's "repetitive and chronic lack of communications [were] hurting our program." Karimi Decl. ¶ 13, Ex. 3, ECF 34.

Dean Karimi and Dr. Fry decided that Hughes should no longer work for the University. On February 19, 2020, the University offered Hughes the opportunity to resign in lieu of termination. Hughes signed a Notice of Resignation and another document stating that she understood she was being terminated.

## DISCUSSION

### A. Evidentiary Objection

The University objects to paragraphs 23 and 25 of Hughes's declaration submitted in support of her opposition to the University's motion for summary judgment. In these paragraphs

---

[7] Although Hughes does not contest the underlying facts, Hughes disputes Dean Karimi's interpretation of these instances as poor communication. She explains, for example, that her failure to set an out-of-office message was due to a known glitch in Outlook. Hughes Decl. ¶ 67. She also explains that the OEE had flexible policies for when employees could take comp time, at least under Dr. Cleven. *Id.* ¶ 10; Cleven Dep. 27:21-25, ECF 44 at 97; Fry Dep. 24:11-25:3, ECF 44 at 211-12 ("It was a practice that was done historically in the office before me by the previous supervisor and then I had to deal with that ramification."). The University offers evidence that even Dr. Cleven expected Hughes to inform her about when Hughes wanted to use her comp time and that Hughes failed to inform Dr. Cleven several times. Cleven Decl. ¶¶ 17-18.

[8] Hughes states that she "never told any student to disclose their health record to the experiential site." Hughes Decl. ¶ 63. Hughes does not contest, however, that the student was upset or experienced stress because of Hughes's email exchange with the student.

she describes voicemail messages that she left for employees of the University. The University

argues that the statements in these paragraphs contradict Hughes's sworn testimony at deposition

and thus are inadmissible under the "sham" affidavit rule.

The sham affidavit rule provides that a party cannot manufacture an issue of fact by

presenting an affidavit that contradicts prior deposition testimony. *Van Asdale v. Int'l Game

Tech.*, 577 F.3d 989, 998 (9th Cir. 2009). Courts are cautioned, however, that:

> It must be recognized that the sham affidavit rule is in tension with
> the principle that a court's role in deciding a summary judgment
> motion is not to make credibility determinations or weigh
> conflicting evidence. Aggressive invocation of the rule also
> threatens to ensnare parties who may have simply been confused
> during their deposition testimony and may encourage
> gamesmanship by opposing attorneys. We have thus recognized
> that the sham affidavit rule "should be applied with caution."

*Id.* (quoting *Sch. Dist. No. 1J v. ACandS, Inc.*, 5 F.3d 1255, 1264 (9th Cir. 1993). The sham

affidavit rule requires that: (1) a court make a factual finding that an alleged contradiction

between a proffered affidavit and prior testimony in fact is a sham; and (2) the contradiction is

clear and unambiguous. *Van Asdale*, 577 F.3d at 998-99; *see also Yeager v. Bowlin*, 693

F.3d 1076, 1080 (9th Cir. 2012).

The University first challenges paragraph 23, in which Hughes describes a voicemail she

left for Michele Quint, a representative in Pacific's Human Resources Department. The

University argues this contradicts Hughes's deposition testimony, in which she testified:

> Q:      Your complaint at paragraph 13 has an allegation that you
> called—you placed a call to Michelle Quint to complain about
> sexism after your meeting with Anita Cleven. Did you actually
> speak with Ms. Quint?
>
> A.      I did not.
>
> Q.      Okay. Did you send her any emails or other information
> about the conversation about the conversation.

> A.    I did not.

ECF 33-1 at 31 (Hughes Dep. 139:18-25). Hughes later testified at deposition with whom she "discussed" the alleged sexism and did not list Quint.

Hughes's deposition testimony does not directly contradict her declaration that she left a voicemail for Quint. Hughes did not testify at deposition that she did not leave a voicemail, she testified that she did not actually speak with Quint. Those are different. Leaving a voicemail is also different from having a "discussion." Thus, there is no contradiction, let alone a clear and unambiguous contradiction. The University's objection is overruled.

The University next challenges paragraph 25, in which Hughes describes leaving a voicemail for Jennifer Yruegas, whom Hughes describes as the "head" of Human Resources. The University argues this contradicts the following deposition testimony by Hughes:

> Q.    Paragraph 15 [of the complaint] goes on to state that you contacted Jennifer Yruegas to complain about sexism regarding how the rules were applied differently. Again, did you actually speak to - -
>
> A.    I did not.
>
> Q.    - - Yruegas?
>
> A.    I believe I left a voicemail message at the time, but I would have been pretty vague about it because I didn't know who would be listening to her voice mails.
>
> Q.    Do you have any recollection of what you said in the voice mail?
>
> A.    Generally when I leave a voice mail I just state my name, my telephone number and please call me back.

ECF 33-1 at 35 (Hughes Dep. 148:7-20).

Hughes's deposition testimony was not definitive about what she said in her voicemail to Yruegas. Hughes testified at deposition that she "would have been" vague and to her general

practice in leaving a voicemail. She did not answer whether she did or did not recall the voicemail message she left. There is some inconsistency with her newly specific recollection of the voicemail's content in her declaration, but it is not a clear and unambiguous contradiction. This is the type of inconsistency that presents a credibility issue better left for the factfinder to resolve after cross examination. The Court overrules this objection by the University.

## B. Motion Challenging Discrimination Claims

Hughes's first and third claims allege sex or gender discrimination under Title VII and ORS § 659A.030. Hughes asserts that the University discriminated against her because of gender or sex by: (a) applying a restricted telework policy to her and not to a male colleague; and (b) denying Hughes's request to use professional development funds. Hughes claims that she suffered adverse employment actions, including termination of her employment.

The University argues that Hughes has not established a prima facie case of discrimination for either the University's application of the remote work policy or the denial of Hughes's request to use professional development funds. Because Hughes discusses termination in her discrimination claim, the Court also analyzes Hughes's termination from employment under the discrimination framework.

Regarding Hughes's prima facie case of discrimination, the University does not dispute that Hughes is a member of a protected class or that she was qualified for the position. The University challenges the third and fourth elements of a prima facie case: whether the University's actions were adverse employment actions and whether Hughes can identify a similarly situated individual. Even if Hughes can establish a prima facie case of discrimination, the University contends that its actions were based on legitimate, nondiscriminatory reasons, and that the record lacks any triable issue of material fact suggesting the University's explanations

were pretext for discrimination against Hughes. The University concludes that Hughes cannot prove that the University took the alleged adverse actions "because of" her sex.

### 1. Legal Standards

Title VII prohibits discrimination with respect to "compensation, terms, conditions, or privileges of employment, because of [an] individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). An employer violates Title VII by, among other things, "offering terms and conditions to employees of one gender that are less favorable than those it offers to employees of the other gender." *Brooks v. City of San Mateo*, 229 F.3d 917, 923 (9th Cir. 2000). These violations can yield "disparate treatment" claims, which are "adverse employment actions motivated by sex." *Maner v. Dignity Health*, 9 F.4th 1114, 1120 (9th Cir. 2021). Examples of Title VII violations include refusing to hire, paying less for the same work, imposing more onerous duties for the same pay, or otherwise permitting less favorable working conditions, based on sex. *Brooks*, 229 F.3d at 923.

Under Oregon law it is an unlawful employment practice to discriminate against an individual "in compensation or in terms, conditions or privileges of employment," because of an individual's sex or other protected characteristics. ORS § 659A.030(1)(b). Because Oregon based ORS § 659A.030 on Title VII, courts analyze state and federal discrimination claims together. *See Dawson v. Entek Int'l*, 630 F.3d 928, 935 (9th Cir. 2011) (holding that the federal burden-shifting framework applies to Oregon discrimination claims); *Heller v. EBB Auto Co.*, 8 F.3d 1433, 1437 n.2 (9th Cir. 1993) (stating that courts construe ORS § 659.030 as "identical to" Title VII (gathering cases)).

Surviving a summary judgment motion requires a plaintiff to establish that an adverse employment action was "because of" her sex and that the different treatment was intentional. *See Bostock v. Clayton Cnty.*, 140 S.Ct. 1731, 1740 (2020). On motions for summary judgment,

courts in the Ninth Circuit evaluate discrimination claims using the three-part burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). *See, e.g.*, *Hawn v. Exec. Jet Mgmt., Inc*., 615 F.3d 1151, 1155 (9th Cir. 2010). Under this framework, a plaintiff must first establish a prima facie case of employment discrimination. *Id*. "If plaintiffs establish a prima facie case, '[t]he burden of production, but not persuasion, then shifts to the employer to articulate some legitimate, nondiscriminatory reason for the challenged action.'" *Id.* (quoting *Chuang v. Univ. of Cal. Davis, Bd. of Trs.*, 225 F.3d 1115, 1123-24 (9th Cir. 2000)); *see also McDonnell Douglas*, 411 U.S. at 802. "If defendant meets this burden, plaintiffs must then raise a triable issue of material fact as to whether the defendant's proffered reasons for their terminations are mere pretext for unlawful discrimination." *Hawn*, 615 F.3d at 1155; *see also McDonnell Douglas*, 411 U.S. at 804.

### a.  Prima facie case of discrimination

To establish a prima facie case of discrimination, a plaintiff may use either direct evidence of discriminatory intent or rely on a presumption arising from the *McDonnell Douglas* factors. *Wallis v. J.R. Simplot Co.*, 26 F.3d 885, 889 (9th Cir. 1994). Direct evidence is evidence that, "if believed, proves the fact of discriminatory animus without inference or presumption." *Vasquez v. Cnty. of Los Angeles*, 349 F.3d 634, 640 (9th Cir. 2003) (cleaned up). Alternatively, a plaintiff may establish a prima facie case of discrimination through the *McDonnell Douglas* framework by showing that: (1) she is a member of a protected class; (2) she was performing the job satisfactorily; (3) she suffered some adverse employment consequence; and (4) similarly situated individuals outside of her protected class were treated more favorably. *Weil v. Citizens Telecom Servs. Co.*, 922 F.3d 993, 1003 (9th Cir. 2019) (citing *McDonnell Douglas*, 411 U.S. at 802).

The Ninth Circuit has also articulated the fourth factor as invoking "other circumstances surrounding the adverse employment action give rise to an inference of discrimination." *Peterson v. Hewlett-Packard Co.*, 358 F.3d 599, 603 (9th Cir. 2004). The Ninth Circuit explained:

> It is true that the elements and contours of a prima facie case will differ according to the facts at hand. . . . We have also stated that a plaintiff may show an inference of discrimination in whatever manner is appropriate in the particular circumstances. A plaintiff may do so through comparison to similarly situated individuals, or any other circumstances surrounding the adverse employment action that give rise to an inference of discrimination.

*Hawn*, 615 F.3d at 1156. But if a plaintiff relies on the comparison to a group of allegedly similarly situated employees to articulate the circumstances giving rise to an inference of disparate treatment, the Court may focus on that comparison. *Id.* at 1157.

When showing a prima facie case of discrimination, a plaintiff need not present much evidence to survive a motion for summary judgment. "The requisite degree of proof necessary to establish a prima facie case for Title VII . . . claims on summary judgment is minimal and does not even need to rise to the level of a preponderance of the evidence." *Wallis,* 26 F.3d at 889.

### b. Pretext

After the plaintiff establishes a prima facie case, the employer must articulate a legitimate, nondiscriminatory reason for the adverse employment action. *Hawn*, 615 F.3d at 1155. Then, the plaintiff may establish pretext "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981); *see also Snead v. Metro. Prop. & Cas. Ins. Co.*, 237 F.3d 1080, 1093-94 (9th Cir. 2001) (explaining that a plaintiff may show pretext through direct or indirect evidence). "[W]hen the plaintiff relies on circumstantial evidence, that evidence must

be specific and substantial to defeat the employer's motion for summary judgment." *Coghlan v. Am. Seafoods Co.*, 413 F.3d 1090, 1095-96 (9th Cir. 2005) (quotation marks omitted). "However, that requirement is tempered by [the Ninth Circuit's] observation that, in the context of Title VII claims, the burden on plaintiffs to raise a triable issue of fact as to pretext is 'hardly an onerous one.'" *Noyes v. Kelly Servs.*, 488 F.3d 1163, 1170 (9th Cir. 2007) (quoting *Payne v. Norwest Corp.*, 113 F.3d 1079, 1080 (9th Cir. 1997)).

Although a plaintiff's burden is higher to show pretext than to prove a prima facie case, "[t]he same evidence can be used to establish a prima facie case *and* to create a genuine issue regarding whether the employer's explanations are pretextual." *Strother v. S. Cal. Permanente Med. Grp.*, 79 F.3d 859, 870 (9th Cir. 1996) (emphasis in original); *see also Miller v. Fairchild Indus., Inc.*, 797 F.2d 727, 732 (9th Cir. 1986) ("To show pretext, the plaintiff is not necessarily required to introduce evidence beyond that already offered to establish her prima facie case, although she may of course provide additional proof of the defendants' unlawful motivation."). "As a general matter, the plaintiff in an employment discrimination action need produce very little evidence in order to overcome an employer's motion for summary judgment. This is because the ultimate question is one that can only be resolved through a searching inquiry—one that is most appropriately conducted by a factfinder, upon a full record." *Chuang*, 225 F.3d at 1124 (quotation marks omitted).

### 2. Remote Work Expectation

Hughes claims that the University's remote work policy was discriminatorily applied based on her sex or gender. This policy required that two female employees, Hughes and Belles, coordinate days that they worked remotely so that at least one coordinator was present in the OEE office. A male colleague, Jackson Ross, was not subject to the remote work policy.

### a. Prima facie case

The University challenges the fourth element of Hughes's prima facie case of discrimination: that "similarly situated individuals outside of her protected class were treated more favorably." *Freyd v. Univ. of Oregon*, 990 F.3d 1211, 1229 (9th Cir. 2021). The University argues that Hughes cannot show that Ross was a similarly situated individual, and no other similarly situated individuals exist. Employees are similarly situated if they have "similar jobs and display similar conduct." *Vasquez*, 349 F.3d at 641. "It is not enough for employees to be in similar employment positions; rather, the plaintiff and the comparator employee must be similarly situated in all material respects." *Weil*, 922 F.3d at 1004 (cleaned up).

The Court agrees with the University on this point. Ross was a strategist; Hughes and Belles were coordinators. Working directly with students by phone, email, or in-person was a substantial portion of the coordinators' jobs. Only coordinators were responsible for maintaining a presence in the office in case an SOP student visited. By contrast, Ross's strategist job at OEE involved technology and operations. Ross was not the primary student contact for the OEE. Ross also worked part-time in another department, where he had a different supervisor. In sum, Hughes and Ross had different job titles, different duties, different supervisors, and worked at least part-time in different departments. Even viewing the record in the light most favorable to Hughes, a reasonable jury could not find that Ross's role was "similarly situated in all material respects" to Hughes's.

Hughes points out that Ross had once performed her role and argues that there is an issue of fact whether Ross "was able to offer to switch work-at-home shifts with Ms. Hughes and Ms. Belles so that they could work from home." Whether Ross could substitute for Hughes or offer to switch work-at-home shifts with Hughes does not create an issue of fact on whether he was a similarly situated employee. Ross's remote work expectations for his job are unlike

Hughes's because they are not similarly situated. Hughes offers no "other circumstances" of the remote work policy that could give rise to an inference of discrimination. *See Hawn*, 615 F.3d at 1156-57. Thus, despite Hughes's low burden at the prima facie stage, Hughes fails to establish a triable issue of material fact on this discrimination theory.

### b.   Legitimate, non-discriminatory reasons

Even if Hughes could establish a prima facie case, the University has offered legitimate, nondiscriminatory reasons for its remote work policy. Dr. Cleven had repeatedly expressed her expectation that at least one coordinator should be present at the office every day. Dr. Cleven believed having at least one coordinator on-site was important to serve SOP students, who would sometimes drop by the OEE office to meet with one of the coordinators without notice. Working directly with students was a significant portion of Hughes's job. Moreover, in the fall of 2018, Dean Karimi went to Hughes's and Belles's shared office to speak to one of them, but they were both absent. After this incident, Dr. Cleven formalized and instituted the remote work policy. Any of these reasons—student drop-ins, the student-facing nature of the role in general, or the Dean's expectations or frustrations regarding absences in that role—could provide a legitimate reason for instituting the remote work policy.

### c.   Pretext

Hughes fails to present evidence that the University's proffered explanation for the policy was a pretext for unlawful discrimination. Other than the comparison to Ross, whom Hughes cannot establish as a similarly situated employee, the only evidence of pretext Hughes offers is testimony from Belles stating that she felt she was "treated differently than some males."[9] But

---

[9] Belles testified, "I recall feeling that I was treated differently than some males, yes. . . . Not in any way that I can specifically associate with gender. It may have been specifically related to job duties." ECF 44 at 191 (Belles Dep. 46:11-16). The University argues that Hughes

evidence of a person's general feeling that they experienced discrimination cannot by itself survive summary judgment. *See, e.g.*, *Martinez-Patterson v. AT&T Services, Inc.*, 2022 WL 2304218, at *1 (9th Cir. 2022) (concluding that a plaintiff's indirect evidence including her own "general feeling" of discrimination "was not sufficiently 'specific and substantial'" to overcome summary judgment on discrimination claim). Hughes fails to create a triable issue as to this disparate treatment claim.

### 3.   Professional Development Funds

In August 2018, a month after she began her job at the University, Hughes requested to use professional development funds for a course on strategic communication and public relations. Hughes alleges that her supervisor, Dr. Cleven, denied the request because Hughes was busy planning a wedding. Hughes interpreted the denial of funds to be based on her sex or gender. The University moves for summary judgment for failure to exhaust administrative remedies, failure to state a prima facie case of discrimination, and lack of evidence of pretext for discriminatory motive.

#### a.   Failure to exhaust administrative remedies

The University first argues that Hughes's Title VII discrimination claim based on the denial of professional development funds should be dismissed because Hughes failed to exhaust her administrative remedies. Title VII provides that "[a] charge under this section shall be filed" with the EEOC "within one hundred and eighty days after the alleged unlawful employment practice occurred." 42 U.S.C. § 2000e-5(e)(1). If the alleged discrimination occurred in a state or political subdivision that has its own agency with authority to grant or seek relief, Title VII

---

does not accurately state the record by attempting to insinuate through this testimony that Belles perceived some discriminatory motive in the remote work policy.

instead directs the individual alleging discrimination to launch proceedings with that agency first. *See id.* § 2000e-5(c). If the state or local proceedings do not resolve the matter, the individual has "three hundred days after the alleged unlawful employment practice occurred," or 30 days after being notified that those proceedings have been "terminated"—"whichever is earlier"—to file a charge with the EEOC. *Id.* § 2000e-5(e)(1). "An individual's failure to file a charge with the agency within this time frame will usually operate to bar that person from bringing a lawsuit for failure to exhaust their administrative remedies." *Arizona ex rel. Horne v. Geo Grp., Inc.*, 816 F.3d 1189, 1202 (9th Cir. 2016); *see also Zipes v. Trans World Airlines, Inc.*, 455 U.S. 385, 393 (1982) (holding that filing a timely charge of discrimination with the EEOC is not jurisdictional because it is subject to waiver, estoppel, and equitable tolling); *Fort Bend Cnty., Texas v. Davis*, 139 S.Ct. 1843, 1852 (2019) ("In sum, a rule may be mandatory without being jurisdictional, and Title VII's charge-filing requirement fits that bill.").

Hughes does not respond to this argument, which is based on facts alleged in her Complaint. Hughes states in her Complaint that she filed a charge with the EEOC on June 25, 2020. The University denied her request for professional development funds in August 2018. The denial thus occurred more than 300 days before Hughes filed the EEOC charge. The Court dismisses Hughes's Title VII claim for denial of professional development funds for failure to exhaust administrative remedies within the timeframe required under Title VII.

### b.  Prima facie case

Because Hughes also alleges a discrimination claim under ORS § 659A.030(1)(b), the Court considers whether Hughes establishes a prima facie discrimination claim for denial of professional development funds. The University argues that the denial of a request to use professional development funds for a course is not an adverse employment action, and therefore Hughes cannot make out a prima facie case for discrimination.

An adverse employment action "is one that materially affects the terms, conditions, or privileges of employment." *Davis v. Team Elec. Co.*, 520 F.3d 1080, 1089 (9th Cir. 2008) (cleaned up). "Among those employment decisions that can constitute an adverse employment action are termination, dissemination of a negative employment reference, issuance of an undeserved negative performance review and refusal to consider for promotion." *Brooks*, 229 F.3d at 928. "Not every employment decision amounts to an adverse employment action." *Strother*, 79 F.3d at 869.

The Court agrees with the University that the mere denial to attend *this* course did not materially affect any aspect of Hughes's employment.[10] *See Kortan v. Cal. Youth Auth.*, 217 F.3d 1104, 1113 (9th Cir. 2000) (finding no adverse employment action because the plaintiff "was not demoted, was not stripped of work responsibilities, was not handed different or more burdensome work responsibilities, was not fired or suspended, was not denied any raises, and was not reduced in salary or in any other benefit"). Hughes testified that she would not have received extra pay if she had completed the course and that she did not know whether the course might impact her job functions. Any potential impact of this course on Hughes's employment is speculative.[11] Without nonspeculative evidence of some material impact on the "terms,

---

[10] Hughes does not argue, and thus the Court does not consider, whether denial of professional development funds generally was an adverse employment action. SOP employees received $2,000 of funds per academic year; as such, professional funds could be considered a privilege of employment at the University. The Court notes, however, that Hughes requested other professional development after requesting this course and the University approved all of those requests. Hughes Dep. 136:6-8.

[11] In her response and declaration, Hughes hypothesizes that denying her use of funds to take a course in strategic communication may rise to the level of action adverse to her employment because one of the University's proffered reasons for termination was Hughes's poor communication with students. But any actual effect of the course on Hughes's communication skills or her career at the University is speculation and cannot alone make out an adverse employment action. *See Casey v. Mabus*, 878 F. Supp. 2d 175, 184 (D.D.C. 2012) (finding denial of taking instructor certification training opportunity was not an adverse

conditions, or privileges" of Hughes's employment, the University's denial of funds for this

particular course does not rise to the level of an adverse employment action.

### 4.  Termination

To the extent that Hughes asserts a discrimination claim based on Hughes's separation

from employment,[12] the claim fails. Hughes does not substantively argue that her separation

occurred *because of* her sex or gender. *See Maner*, 9 F.4th at 1120 (Title VII prohibits "adverse

employment actions motivated by sex"). Hughes provides no evidence suggesting that her sex or

gender caused Hughes's separation.[13]

Even assuming that Hughes could make a prima facie case, the University provides

legitimate, non-discriminatory reasons terminating Hughes's employment, including her poor

_____

employment action because it was "pure speculation" that attending the training would result in career advancement). Further, even viewing the evidence in the light most favorable to Hughes, there are no facts suggesting that the course material was relevant to Hughes's student-facing communications or could have improved her ability to communicate absences to her supervisors. A certificate in strategic communications could instead provide credentials in crafting messaging to the public during crisis situations or writing press releases to the media.

[12] Hughes's discrimination claim implies, but does not directly state, that she is suing the University for sex discrimination based on her separation from employment. *See* Compl. ¶ 33 ("Defendant discriminated against [Hughes] with respect to the terms and conditions of her employment including compensation because of [Hughes]'s gender and sex as alleged above. Defendant ultimately discharged [Hughes] from employment."); ECF 43 at 38 (Pl.'s Resp.) ("She suffered adverse employment actions including termination of her employment.").

[13] In her response, Hughes suggests that denying professional development funds because Hughes was busy planning a wedding is evidence of an impermissible motive behind the University's decisions, including the decision to terminate her employment. *See* ECF 43 at 41. Plaintiff does not elaborate on how denying her professional funds in August 2018, a month after she started her job, is connected to her termination in February 2020. Moreover, Hughes presents evidence that the person who denied Hughes's proposed use of professional development funds, Dr. Cleven, left her position in December 2019 and never recommended that Hughes should be terminated. The Court concludes that the mere denial of professional funds here, without more, is not a "circumstance[] surrounding the adverse employment action giv[ing] rise to an inference of discrimination" that could enable Hughes to make out a prima facie case of discrimination on this adverse employment action. *Peterson*, 358 F.3d at 603.

work communication, absences from work without notice, and mishandling of student concerns. Hughes does not offer direct or "specific and substantial" circumstantial evidence to show that the University's legitimate reasons for her termination are pretextual. *Coghlan*, 413 F.3d at 1095-96. Thus, Hughes not shown any triable issue of material fact that her separation from employment had anything to do with her sex or gender.

## C.  Motion Challenging Retaliation Claims

Hughes's second and third claims against the University assert liability for retaliation under Title VII and ORS § 659A.030. Hughes's sixth claim alleges whistleblower retaliation under ORS § 659A.199. Hughes asserts that the University subjected her to retaliation because she opposed sex or gender discrimination by her participation on the committee that conducted the SOPAC staff survey.

### 1.  Standards for Retaliation under Title VII and ORS § 659A.030(1)(f)

"Title VII prohibits retaliation against any individual 'because he has opposed any practice made an unlawful employment practice by this subchapter.'" *Maner*, 9 F.4th at 1127 (quoting 42 U.S.C. § 2000e-3(a)). Title VII retaliation is analyzed under the same *McDonnell Douglas* burden shifting framework as Title VII discrimination. *See Brooks*, 229 F.3d at 928. To establish a prima facie case of retaliation under Title VII, a plaintiff must show that (1) she engaged in a protected activity, (2) she suffered an adverse employment action, and (3) there was a causal link between her protected activity and the adverse employment action. *Id.*; *see also Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1064 (9th Cir. 2002).

"If a plaintiff establishes a prima facie case of unlawful retaliation, the burden shifts to the defendant employer to offer evidence that the challenged action was taken for legitimate, non-discriminatory reasons." *Dawson*, 630 F.3d at 936. "If the employer provides a legitimate

explanation for the challenged decision, the plaintiff must show that the defendant's explanation is merely a pretext for impermissible discrimination." *Id.*

Hughes also brings a state law sex discrimination retaliation claim under ORS § 659A.030(1)(f). Courts analyze these Oregon law retaliation claims together with Title VII retaliation claims because "[t]he elements of a *prima facie* case under ORS § 659A.030(1)(f) are substantially similar" to those for retaliation under Title VII. *Meyer v. State ex rel. Or. Lottery*, 292 Or. App. 647, 678 (2018); *see also Portland State Univ. Chapter of Am. Ass'n of Univ. Professors v. Portland State Univ.*, 352 Or. 697, 712 (2012) ("Title VII also contains an antiretaliation provision that is analogous to ORS § 659A.030(1)(f) . . . .").

### 2.   Standards for Whistleblower Retaliation under ORS § 659A.199

Claims for whistleblower retaliation under ORS § 659A.199 are statutory claims whose elements derive from the statute. *See Burley v. Clackamas Cnty.*, 298 Or. App. 462, 465-66 (2019) (interpreting ORS § 659A.199 through principles of statutory construction); *Hall v. State*, 274 Or. App. 445 (2015). The text of ORS § 659A.199 reads:

> It is an unlawful employment practice for an employer to discharge, demote, suspend or in any manner discriminate or retaliate against an employee with regard to promotion, compensation or other terms, conditions or privileges of employment for the reason that the employee has in good faith reported information that the employee believes is evidence of a violation of a state or federal law, rule or regulation.

ORS § 659A.199(1). In other words, this whistleblowing statute "prohibit[s] employers from retaliating against an employee as a result of the employee's report of certain improper activities." *Hall*, 274 Or. App. at 451. "Whether the employee is protected depends upon an assessment of the employee's good faith or reasonableness attendant to that report." *Id.*

Different whistleblowing statutes under Oregon law require various standards of belief at the time of reporting. For claims under § 659A.199, a plaintiff need only show that she had a

"*subjective*, good faith" belief that she reported evidence of a violation of a law, rule, or regulation. *Hall*, 274 Or. App. at 453 (emphasis added). "[G]ood faith relates to what the employee knew at the time of the report, not to what might be shown later to be reasonable with the benefit of hindsight." *Id.* at 452.

### 3. Analysis

The University argues that Hughes's participation in the SOPAC committee was not protected activity and asks for summary judgment on this ground alone. Alternatively, the University argues that Hughes fails to establish a causal link between her alleged protected activity and her termination.[14]

### a. Protected Activity in General

Under Title VII, a plaintiff engages in protected activity when they either (1) "oppose[] any practice made an unlawful employment practice" under Title VII, or (2) testify, assist, or participate "in any manner" in an investigation or proceeding regarding an employer's alleged unlawful practices. 42 U.S.C. § 2000e-3(a); *Raad v. Fairbanks N. Star Borough Sch. Dist.*, 323 F.3d 1185, 1197 (9th Cir. 2003). "Depending on the circumstances, reports of improper workplace behavior can be protected activity under Title VII." *E.E.O.C. v. Go Daddy Software, Inc.*, 581 F.3d 951, 962 (9th Cir. 2009). "Opposing" an employer's discriminatory practice does not necessarily require the employee to instigate action, but it does involve some effort to "resist

---

[14] The University's motion for partial summary judgment originally identified four alleged actions in retaliation for Hughes's participation in the SOPAC committee: (1) applying a remote work policy to her and her colleague, and not a male colleague; (2) Dean Karimi's attitude changing toward Hughes; (3) removing plaintiff from the SOPAC at the end of the 2018-2019 school year; and (4) offering Hughes resignation in lieu of termination from the University. In her response, Hughes identified only one adverse employment action: her termination from employment. ECF 43 at 34 ("Plaintiff has suffered an adverse employment action, she was terminated."). The Court thus considers only termination as an adverse employment action.

or antagonize" the employer. *See Crawford v. Metro Gov't of Nashville & Davidson Cnty.*, 555

U.S. 271, 276-77 (2009) (explaining that "a person can 'oppose' by responding to someone

else's question just as surely as by provoking the discussion"). Also, to establish a prima facie

case under Title VII and ORS § 659A.030, "the plaintiff must make some showing sufficient for

a reasonable trier of fact to infer that that the defendant was aware that the plaintiff had engaged

in protected activity." *See Raad*, 323 F.3d at 1197.

Under ORS § 659A.199, a plaintiff engages in protected activity when they have "in

good faith reported information that the employee believes is evidence of a violation of a state or

federal law, rule or regulation." ORS § 659A.199(1). Thus the plaintiff must provide evidence of

a "report" or "disclosure" of wrongdoing. *Folz v. State by & through Or. Dep't of Transp.*, 287

Or. App. 667, 675 (2017). ORS § 659A.199 also requires an employer's awareness of the report.

*See Larmanger v. Kaiser Found. Health Plan N.W.*, 895 F. Supp. 2d 1033, 1050-51 (D.

Or. 2012) (finding that the plaintiff could not prove a retaliation claim under ORS § 659A.199

because she did not establish that the decision-makers knew that the plaintiff had complained).

### b.  SOPAC as Protected Activity

The University argues that Hughes's participation on the SOPAC and involvement with

the staff survey is not protected activity regardless of whether the information contained in the

survey summary reported unlawful behavior. The University contends that the SOPAC was

merely carrying out its typical duties as an assessment committee to conduct surveys that are

required by the University's accrediting body; the committee's goal was not to report unlawful

practices. Thus, according to the University, Hughes's participation with the survey does not

reflect any affirmative disclosure of unlawful information that could be considered protected

conduct under ORS § 659A.199, Title VII, or ORS § 659A.030.

The evidence shows that the Dean and SOPAC Executive Committee directed the SOPAC to conduct a survey as part of its regular process. Plaintiff offers no evidence that either the individual employees of the SOPAC or the staff group took it upon themselves to survey staff experiences with the intent to oppose unlawful practices, to participate in an investigation or proceeding regarding the University's alleged unlawful practices, or to report discrimination. Some of the staff *responses* to the survey questions alleged sexism, racism, and potentially illegal employment practices, such as employees not getting lunch or rest breaks. But Hughes's roles in the SOPAC survey were to help develop the qualitative survey questions alongside her colleague, Andrew Longhofer, and to collate the responses into a draft report that the whole staff committee worked together to revise. Dr. Carter, not Hughes, delivered the report to the Dean and the SOP executive committee. Hughes alleges that she was the staff representative for SOPAC, but she does not explain how this title would alter her role.

Unlike other retaliation or whistleblower plaintiffs, Hughes does not offer any evidence that she reported any information contained in the survey or took any other action with the survey responses. *Cf. Hidalgo-Semlek v. Hansa Med., Inc.*, 498 F. Supp. 3d 236, 263 (D.N.H. 2020) (denying summary judgment based on evidence that the plaintiff objected to providing survey data out of concern it violated the Health Insurance Portability and Accountability Act); *Knox v. City of Portland*, 543 F. Supp. 2d 1238, 1248 (D. Or. 2008) (finding that the plaintiff engaged in protected activity by complaining to human resources about harassment and discrimination). Hughes only offers that she requested a meeting with HR and that she had the intent to discuss the survey responses. Hughes does not state that she reported any contents of the staff report in this email or even conveyed her desired topic for the meeting in this email. Hughes does not provide the email itself. Hughes also offers no evidence to suggest

that the University was aware Hughes made any report of illegal or improper conduct of the University.

The evidence presented fails to establish that Hughes's participation in the SOPAC survey is a protected activity under Title VII, and by extension, ORS § 659A.030. Employee activities not intended to oppose an unlawful employment practice or to participate in "an investigation, proceeding, or hearing" under Title VII are not "protected activities" for purposes of Title VII. 42 U.S.C. § 2000e-3(a); *Raad*, 323 F.3d at 1197. Hughes made no effort or expressed any intent to "resist," "antagonize," or in any way "oppose" the University by helping SOPAC conduct and summarize a staff survey. *See Crawford*, 555 U.S. at 276. That the responses alleging illegal employment practices were based on a survey Hughes helped develop does not, without more evidence of her intent to oppose these practices, transmute agency to Hughes. Nor does Hughes argue or present facts to suggest that the survey was "an investigation, proceeding, or hearing" under Title VII. The Court thus concludes that Hughes's participation in the SOPAC survey does not constitute protected conduct under Title VII or ORS § 659A.030.

For similar reasons, this evidence fails to offer a triable issue of fact under ORS § 659A.199. Hughes resembles the human resource manager in *Folz*, who alleged that she "report[ed] possible violations of disability discrimination laws," but whom the Oregon Court of Appeals found had not engaged in protected activity under ORS § 659A.199 because her recommendations were "made in the course of her regular work duties as a human resources professional." *Folz*, 287 Or. App. at 669, 674. The court in *Folz* clarified that those whose jobs involve personnel matters are still protected by whistleblowing laws, but such employees must report wrongdoing:

> To be clear, we do not mean to suggest that individuals who are
> employed in positions that require participation in decisions

regarding legal compliance are exempt from, or are entitled to less protection under, Oregon's whistleblowing laws. We recently addressed that issue in *Harper v. Mt. Hood Community College*, 283 Or. App. 207, 208-09, 216 (2016), in which we held that a genuine issue of material fact existed as to whether the plaintiff's termination from her job—which included investigating complaints against college employees and ensuring compliance with the law—was in retaliation for her protected disclosures. In that case, the evidence showed that the plaintiff had made reports of nine incidents involving "age discrimination, food stamp fraud, procurement fraud, bullying and harassment, and misuse of funds" by employees. *Id.* at 209. We rejected the defendant's argument that the plaintiff could not have been engaged in "protected activity" because she was merely doing her job by reporting problems . . . .

The difference between this case and *Harper* is that plaintiff has failed to produce any evidence that she ever made a report that any violation or wrongdoing had occurred. Viewing the record in the light most favorable to plaintiff, the most she has established is that she gave advice about an evolving personnel matter as part of her day-to-day responsibilities as a human resources professional and that she expressed those opinions to other participants in that decision-making process *as part of that process*. Such conduct is neither a "report" nor a "disclosure" of wrongdoing.

*Id.* at 674-75 (emphasis in original).

Similarly, Hughes's participation in the SOPAC survey design and summary with the other members of the SOPAC was neither a "report" nor a "disclosure" of wrongdoing under ORS § 659A.199. *See id.*; *see also Brunozzi v. Cable Comms., Inc.*, 851 F.3d 990, 1000 (9th Cir. 2017) (interpreting "reporting" under ORS § 659A.199 to mean a "report of information to either an external or internal authority"). And Hughes does not suggest that she had a subjective, good-faith belief that she was reporting evidence of a violation of a law, rule, or regulation through her survey participation, as required under ORS § 659A.199. *See Hall*, 274 Or. App. at 453. Thus, Hughes did not participate in a protected activity under ORS § 659A.199.

### c.  Other Protected Activities

In response to the University's motion for summary judgment, Hughes suggests that she took actions akin to those in *Knox*, 543 F. Supp. 2d at 1248, because she called HR representative Michele Quint and then director Jennifer Yruegas in September 2018 to report that she was personally experiencing the discriminatory application of rules related to professional development funds based on her sex or gender. According to Hughes, these reports were a protected activity under ORS § 659A.199.

As discussed above, the University disputes Plaintiff's evidence. The Court overrules the University's objections and, at summary judgment, views the facts in the light most favorable to Plaintiff. Thus, the Court accepts for purposes of this motion that Hughes's voicemails constitute a protected activity. The Court thus considers whether the September 2018 calls were the cause of Hughes's separation from the University.

### d.  Causal Link

To make out a prima facie case of retaliation, Hughes's retaliation claims require a causal link. *See Villiarimo*, 281 F.3d at 1064 (Title VII and thus ORS 659A.030); *see also Rohrer v. Oswego Cove, LLC*, 309 Or. App. 489, 497 (2021) (requiring a causal link for claims under § 659A.199). To prove a causal link, the plaintiff "must establish that his or her protected activity was a but-for cause of the alleged adverse action by the employer," not just a motivating factor. *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 362-63 (2013). "This requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Id.* at 360; *see also Westendorf v. W. Coast Contractors of Nev., Inc.*, 712 F.3d 417, 422 (9th Cir. 2013) ("To make out such a claim, [the plaintiff] had to show that her protected conduct was a but-for cause—but not necessarily the only cause—of her termination."). A plaintiff may satisfy the causation element through "circumstantial evidence,

such as the employer's knowledge that the plaintiff engaged in protected activities and the

proximity in time between the protected action and the allegedly retaliatory employment

decision." *Yartzoff v. Thomas*, 809 F.2d 1371, 1376 (9th Cir. 1987).

Hughes gives only one example to support a causal link between any protected activity

and her termination: Hughes's interactions with Dean Karimi in April 2019, shortly after he

received the SOPAC survey. Hughes describes the Dean's reaction to the survey report as

negative. In response to an email from Hughes, Dean Karimi sought to meet in person on

April 10, 2019, but Hughes was working from home. In Hughes's account of the rescheduled

meeting on April 22, 2019, Dean Karimi became upset at Hughes for representing herself as the

SOPAC staff representative, the format of the survey, and her remote work behavior.

As discussed above, Hughes's involvement with the SOPAC survey, including her email

to Yruegas asking only to set up an appointment, was not a protected activity. Hughes's only

potential protected activities were the September 2018 voicemails to Quint and Yruegas in HR

about the allegedly discriminatory application of the University's professional development fund

policy. Even if Dean Karimi's comments in April 2019 indicate that he was upset about the

SOPAC staff survey, this evidence does not support any causal connection to Hughes's

September 2018 voicemails. Hughes also does not allege that Dean Karimi had any idea that she

had made those phone calls or was aware of Hughes's professional development funds request.

Hughes also states that Dean Karimi and her supervisor made the decision to terminate Hughes's

employment—not Yruegas or Quint. Thus, Hughes offers no argument or evidence to connect

the September 2018 phone calls to her employment termination on February 19, 2020.

Temporal proximity can stand alone as evidence of causation, but only when the temporal

proximity between the employer's knowledge of the protected conduct and the adverse

PAGE 32 – OPINION AND ORDER

employment action is "very close." *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001); *Boynton-Burns v. Univ. of Or.*, 197 Or. App. 373, 381 (2005); *see also Bell v. Clackamas Cnty.*, 341 F.3d 858, 865-66 (9th Cir. 2003). The September 2018 phone messages to Quint and Yruegas about the remote work policy and professional development funds were 17 months before Hughes's separation from the University in February 2020. "A nearly 18-month lapse between protected activity and an adverse employment action is simply too long, by itself, to give rise to an inference of causation." *Villiarimo*, 281 F.3d at 1065 (citing cases in which a gap of one year or eight months could not establish a causal connection between a plaintiff's protected activity and termination).

Having found no evidence of causation, the Court concludes that Hughes has failed to establish her prima facie case for retaliation under ORS § 659A.199, Title VII, or ORS § 659A.030. Further, as discussed above, the University offers legitimate, non-discriminatory reasons for Hughes's termination in February 2020. Hughes does not offer evidence of pretext. Thus, the Court grants summary judgment on these claims.

## D.  Wrongful Termination

Hughes's seventh claim is a common law wrongful termination claim. As discussed above, Hughes's claims that her termination was wrongfully retaliatory or based on discrimination fail and thus her wrongful discharge claim also fails. Hughes's wrongful discharge claim also fails as a matter of law for another reason: it is precluded by the availability of adequate statutory remedies, which bar common-law wrongful discharge claims. *See Walker v. State by & through Or. Travel Info. Council*, 367 Or. 761, 778 (2021) (explaining that the "common law wrongful discharge is an interstitial tort: The tort may only be invoked when another claim does not provide a plaintiff with an adequate remedy"). Because Plaintiff's discrimination, retaliation, and whistleblower claims all have adequate remedies under Oregon

law, Plaintiff may not assert a common law wrongful discharge claim. *See id.* at 779 n.4

(explaining that the current version of ORS 659A.203, protecting public employee

whistleblowers, allows the same remedies as ORS 659A.199, which allows for the remedies of

ORS chapter 659A, which afford a plaintiff a complete remedy, precluding a wrongful discharge

claim). The Court grants summary judgment on this claim.

## CONCLUSION

The Court GRANTS Defendant Pacific University's Motion for Partial Summary

Judgment, ECF 32.

**IT IS SO ORDERED**.

DATED this 13th day of November, 2023.

/s/ *Michael H. Simon*
Michael H. Simon
United States District Judgestate-law